COPY

FILED
CLERK, U.S. DISTRICT COURT
JAN 26 2011
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

Joseph J. Tabacco, Jr. (SBN 75484)
jtabacco@bermandevalerio.com
Nicole Lavallee (SBN 165755)
nlavallee@bermandevalerio.com
Marie G. Quashnock (SBN 153567)
mquashnock@bermandevalerio.com
**BERMAN DeVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Attorneys for Plaintiff The Fresno County Employees' Retirement Association*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

THE FRESNO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION,

Plaintiff,

vs.

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE HOME LOANS, INC., a New York corporation, ANGELO R. MOZILO, DAVID SAMBOL, ERIC P. SIERACKI, STANFORD L. KURLAND, HENRY G. CISNEROS, JEFFREY M. CUNNINGHAM, ROBERT J. DONATO, MICHAEL E. DOUGHERTY, BEN M. ENIS, CARLOS M. GARCIA, EDWIN HELLER, GWENDOLYN STEWART KING, MARTIN R. MELONE, OSCAR P. ROBERTSON, KEITH P. RUSSELL, HARLEY W. SNYDER, KPMG LLP, a Delaware LLP, BANC OF AMERICA SECURITIES LLC, a Delaware LLC, J.P MORGAN SECURITIES INC., a Delaware corporation, COUNTRYWIDE SECURITIES CORPORATION, a California corporation, BARCLAYS CAPITAL INC., a Connecticut

**Case No.** CV11-0811 PA (SHx)

**COMPLAINT**

**Jury Demanded**

corporation, DEUTSCHE BANK SECURITIES INC., a Delaware corporation, HSBC SECURITIES (USA) INC., a Delaware corporation, WELLS FARGO SECURITIES, LLC, a Delaware LLC, RBS SECURITIES INC., a Delaware corporation, CITIGROUP GLOBAL MARKETS INC., a New York corporation, RBC CAPITAL MARKETS CORPORATION, a New York corporation, ABN AMRO INCORPORATED, a New York corporation, and BNP PARIBAS SECURITIES CORP., a Delaware corporation,

Defendants.

# TABLE OF CONTENTS

**PAGE**


I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 10

III. THE PARTIES ..... 11

A. Plaintiff ..... 11

B. Defendants ..... 11

1. Countrywide ..... 11

2. The Officer Defendants ..... 12

3. Additional Individual Defendants ..... 17

4. Underwriter Defendants ..... 19

5. KPMG ..... 20

IV. BACKGROUND REGARDING COUNTRYWIDE'S BUSINESS ..... 21

A. Countrywide's Business ..... 21

B. Countrywide Started To Produce More Nontraditional and Far Riskier Loan Products ..... 23

1. Countrywide Sought To Gain Market Dominance ..... 23

2. Countrywide Began Offering A Wide Array Of Nontraditional and Riskier Mortgage Products ..... 28

V. COUNTRYWIDE DID NOT MAINTAIN OR APPLY STRONG UNDERWRITING STANDARDS OR PROPERLY INCREASE LOAN LOSS RESERVES TO ACCOUNT FOR THE INCREASED RISKS ASSOCIATED WITH ITS LOAN PORTFOLIO PARTICULARLY AS THE MARKET STARTED TO DECLINE ..... 32

A. Countrywide's Risk and Liquidity Exposure Increased ..... 32

B. Countrywide Loosened Its Underwriting Standards ..... 38

1. Countrywide Loosened Its Underwriting Standards As Indicated In The Company's Underwriting Matrices ..... 39

2. The Company Also Broadened The Scope Of Permissible Exceptions ..... 41

C. Countrywide Also Engaged In a Company-Wide Practice of Originating and Funding Loans Without Regard to

Underwriting Standards Regarding Loan Quality and Engaged in Predatory Lending....44

D. Countrywide Also Relied on Inflated Appraisals....50

E. Countrywide Belatedly Tightened Underwriting Guidelines in 2007....53

F. Countrywide Misclassified Subprime Loans as Prime in its Annual and Quarterly Reports....55

G. Countrywide Adopted An Incentive Compensation Scheme That Wrongly Encouraged Lending Personnel To Push Risky Nontraditional Loans....61

H. Countrywide Made Material Misstatements in Its Financial Statements in Violation of GAAP....64

1. Background....64

2. Risk Factors....65

a. Risk Factors in 2004....65

b. Risk Factors in 2005....66

c. Risk Factors in 2006....67

d. Risk Factors in 2007....67

3. Inadequate ALL Inflated Countrywide's Earnings....68

a. LHI Increased Without Proportionate Increase in ALL As Portfolio Credit Risk Increased....71

b. Underwriting Practices Deteriorated and Nonprime Loan Originations Increased....72

c. Nonaccrual ARM Delinquencies and Delinquent HELOCs Increased at Significant Rate....75

d. Accumulated Negative Amortization on Pay Option ARMs Held For Investment Increased Dramatically....75

4. Overstated RI From Securitizations Inflated Countrywide's Earnings....76

5. Overstated MSR Inflated Countrywide's Earnings....80

a. Improper MSR Valuations in Violation of GAAP....81

b. Valuation Allowance Did Not Accurately Reflect Increased Credit Risk....82

c. Drastic Write-Down of Fair Value of MSR....84

6. Understated Reserves For R&Ws Inflated Countrywide's Earnings ..... 86

7. Ineffective Internal Controls Over Financial Reporting ..... 89

I. Countrywide Misrepresented Access to Liquidity and Value of Excess Capital. ..... 93

1. Countrywide Misrepresented Its Access to Liquidity. ..... 93

2. Countrywide Overstated Its Capital. ..... 94

VI. DEFENDANTS MADE FALSE AND MISLEADING MATERIAL STATEMENTS AND OMISSIONS ..... 95

A. The Company's False Statements Regarding 2003 ..... 96

1. 2003 Form 10-K ..... 96

B. The Company's False Statements Regarding 2004 Results ..... 100

1. First Quarter 2004 Form 8-K ..... 100

2. First Quarter 2004 Conference Call ..... 100

3. First Quarter 2004 Form 10-Q ..... 102

4. Amended First Quarter 2004 Form 10-Q/A ..... 103

5. Second Quarter 2004 Form 8-K ..... 104

6. Second Quarter 2004 Conference Call ..... 105

7. Second Quarter 2004 Form 10-Q ..... 106

8. Amended Second Quarter 2004 Form 10-Q/A ..... 107

9. Third Quarter 2004 Form 8-K ..... 108

10. Third Quarter 2004 Conference Call ..... 109

11. Third Quarter 2004 Form 10-Q ..... 110

12. Amended Third Quarter 2004 Form 10-Q/A ..... 111

13. Year End 2004 Form 8-K ..... 112

14. Year End 2004 Conference Call ..... 113

15. 2004 Form 10-K ..... 113

C. The Company's False Statements Regarding 2005 Results ..... 118

1. March 15, 2005 Piper Jaffray Conference ..... 118

2. First Quarter 2005 Form 8-K ..... 121

3. First Quarter 2005 Conference Call ........ 122

4. First Quarter 2005 Form 10-Q ........ 123

5. June 2, 2005 Sanford Bernstein & Co. Strategic Decisions Conference ........ 125

6. Second Quarter 2005 Form 8-K ........ 126

7. Second Quarter 2005 Conference Call ........ 127

8. Second Quarter 2005 Form 10-Q ........ 130

9. September 13, 2005 Lehman Brothers Financial Services Conference ........ 132

10. Third Quarter 2005 Form 8-K ........ 133

11. Third Quarter 2005 Conference Call ........ 133

12. Third Quarter 2005 Form 10-Q ........ 134

13. Year End 2005 Form 8-K ........ 136

14. Year End 2005 Conference Call ........ 136

15. 2005 Form 10-K ........ 137

D. The Company's False Statements Regarding 2006 Results ........ 141

1. First Quarter 2006 Form 8-K ........ 141

2. First Quarter 2006 Conference Call ........ 142

3. First Quarter 2006 Form 10-Q ........ 143

4. May 17, 2006 American Financial Services Association Finance Industry Conference for Fixed Income Investors ........ 145

5. Second Quarter 2006 Form 8-K ........ 147

6. Second Quarter 2006 Conference Call ........ 147

7. Second Quarter 2006 Form 10-Q ........ 148

8. September 12, 2006 Equity Investors Forum ........ 150

9. September 13, 2006 Fixed Income Investor Forum ........ 152

10. Third Quarter 2006 Form 8-K ........ 154

11. Third Quarter 2006 Conference Call ........ 155

12. Third Quarter 2006 Form 10-Q ........ 156

13. Year-End 2006 Form 8-K ........ 158

14. Year-End 2006 Conference Call ..... 158

15. 2006 Form 10-K ..... 160

E. The Company's False Statements Regarding 2007 Results Before The Truth Begins To Emerge ..... 165

1. March 6, 2007 Raymond James Institutional Investor Conference ..... 165

2. First Quarter 2007 Form 8-K ..... 166

3. First Quarter 2007 Conference Call ..... 166

4. April 26, 2007 AFSA 7th Finance Industry Conference ..... 168

5. First Quarter 2007 Form 10-Q ..... 171

VII. THE REGISTRATION STATEMENTS AND PROSPECTUSES FOR COUNTRYWIDE'S AND CHL'S OFFERINGS OF DEBT SECURITIES CONTAINED UNTRUE STATEMENTS ..... 174

A. Series M Medium-Term Notes ..... 175

B. Series A Medium-Term Notes ..... 175

VIII. DESPITE DEFENDANTS' EFFORT TO CONCEAL THE TRUTH, CURATIVE DISCLOSURES SLOWLY REVEALED THE TRUE FACTS ..... 177

A. Partial Corrective Disclosures and Continued Misrepresentations on July 24, 2007 ..... 177

B. Misrepresentations on August 2, 2007 ..... 181

C. Corrective Disclosures and Continued Misrepresentations on August 9, 2007 ..... 182

D. Corrective Disclosure on August 14, 2007 ..... 184

E. Corrective Disclosure on August 15, 2007 ..... 185

F. Corrective Disclosures on August 16, 2007 ..... 186

G. Positive News and Misrepresentations on August 23, 2007 ..... 187

H. Corrective Disclosure on August 24, 2007 ..... 188

I. Corrective Disclosure on September 10, 2007 ..... 188

J. Corrective Disclosure on October 24, 2007 ..... 189

K. Corrective Disclosure and Continued Misrepresentations on October 26, 2007 ..... 190

L. Corrective Disclosure on October 30, 2007 ..... 192

M. Corrective Disclosure on November 7, 2007 .......... 193

N. Misrepresentations on November 9, 2007 - Third Quarter 2007 Form 10-Q .......... 194

O. Corrective Disclosure on November 26, 2007 .......... 196

P. Corrective Disclosure on December 13, 2007 .......... 197

Q. Corrective Disclosure and Continued Misrepresentations on January 8, 2008 .......... 198

R. Corrective Disclosure on January 9, 2008 .......... 199

S. January 11, 2008 Merger Announcement .......... 200

T. Misrepresentation on January 29, 2008 .......... 201

U. Corrective Disclosure on March 6, 2008 .......... 201

V. Corrective Disclosure on March 8, 2008 .......... 202

IX. ADDITIONAL ALLEGATIONS SUPPORTING THE OFFICER DEFENDANTS' SCIENTER .......... 203

A. Since Mortgage Banking Was Countrywide's "Core Business," the Officer Defendants Closely Monitored the Company's Underwriting Standards, Lending Practices and Credit Risk Exposure .......... 204

B. The Officer Defendants' Own Statements Touting The Company's Loan Origination And Underwriting Policies Demonstrate Their Intimate Knowledge Of The Company's Core Business .......... 205

C. CWs Confirm The Officer Defendants' Knowledge Of the Loosening Underwriting Standards .......... 207

D. Nature Of The GAAP Violations Further Evidence That The Officer Defendants Were Aware Of, Or Recklessly Disregarded, The Company's Violations Of GAAP And Reporting Of False Financial Statements .......... 210

E. The Officer Defendants Engaged In Insider Selling .......... 213

X. KPMG'S NEGLIGENT OR RECKLESS FAILURE TO CONDUCT AUDITS IN ACCORDANCE WITH GAAS. .......... 214

A. The Standards of GAAS and the AICPA Audit & Accounting Guide .......... 215

B. Audit Risk Factors in 2004 .......... 217

1. Red Flag: Implementation of Aggressive Goal to Capture 30% Market Share .......... 217

2. Red Flag: Improper Documentation for Loans,

Misclassification of Subprime Loans as Prime Loans and Management Overrides....218

3. Red Flag: 99% Increase In Nonprime Loans, 108% Increase In ARM Loans, 71% Increase In HELOC Loans ...219

4. Red Flag: ALL as a Percentage of LHI Remained Flat Despite Increase in Higher Risk Loans ....220

5. Red Flag: Increase in MSR Balance, But Decrease in Valuation Allowance ....221

6. Red Flag: Based on Credit Risk Increases, Flawed Assumptions Used to Value RI ....222

C. Audit Risk Factors in 2005 ....223

1. Red Flag: Implementation of Countrywide's Exception Processing System ....224

2. Red Flag: Shocking 335% Increase In Pay Option ARM Loan Origination....225

3. Red Flag: 99% Increase in HELOC Delinquencies ....226

4. Red Flag: Despite Increased Credit Risks, ALL as a Percentage of LHI Decreased....227

5. Red Flag: Increase in Prime Rate From 2004 ....227

6. Red Flag: Valuation Allowance For Impairment Of Countrywide's MSRs Dropped From 11% To Only 3% Of Gross MSRs....228

7. Red Flag: Decrease in Net Lifetime Credit Losses And Unreasonable Weighted Average Life Of Retained Interests....228

8. Red Flag: 27% Drop in New R&W Provisions As A Percentage Of Relevant Securitizations ....229

D. Audit Risk Factors in 2006 ....229

1. Red Flag: Accumulated Negative Amortization on Pay Option ARMS Increased 775%....230

2. Red Flag: 87% Increase in HELOC Delinquencies ....231

3. Red Flag: ALL as a Percentage of LHI Remained Flat ....231

4. Red Flag: No Modification to Fair Value Assumptions Used in MSR Model ....232

5. Red Flag: Historical Performance Used to Calculate Fair Value Of Retained Interests....232

6. Red Flag: Insufficient R&W Reserve Relative To

Skyrocketing Delinquency Rates ....................................233
XI. ADDITIONAL FACTS REGARDING THE FAILURE OF THE UNDERWRITER DEFENDANTS TO CONDUCT ADEQUATE DUE DILIGENCE ....................................234
XII. LOSS CAUSATION AND DAMAGES ....................................236
XIII. APPLICABLILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ....................................238
XIV. NO SAFE HARBOR....................................239
COUNTS ....................................240
COUNT I ....................................240
COUNT II ....................................243
COUNT III....................................245
COUNT IV ....................................247
COUNT V....................................250
COUNT VI ....................................252
COUNT VII ....................................255
COUNT VIII....................................256
COUNT IX ....................................258
COUNT X....................................260
COUNT XI ....................................261
XV. PRAYER FOR RELIEF....................................262
XVI. JURY DEMAND ....................................263

Plaintiff, The Fresno County Employees' Retirement Association ("FCERA"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters:

## I. SUMMARY OF THE ACTION

1. Defendant Countrywide Financial Corporation ("Countrywide" or "the Company") was a holding company founded in March 1969 that eventually became, through its subsidiaries as described herein, the largest mortgage lender in the United States, providing mortgage lending and other finance-related businesses, including mortgage banking, retail banking and mortgage warehouse lending, securities dealing, insurance underwriting and international mortgage loan processing and servicing.

2. Historically, Countrywide was known as one of the largest mortgage lenders in the United States, which primarily offered traditional fixed-rate first-lien mortgage loans to borrowers. Countrywide purchased and originated these loans, then packaged and sold pools of home loans and securitizations to the "secondary market", in order to generate income to fund its long-term capital needs. Because Countrywide's loans were primarily conforming loans that met with the requirements of Government Sponsored Entities ("GSEs"), such as Fannie Mae and Freddie Mac, they were considered safer investments by the secondary market and were therefore sold at "premium" prices.

3. Countrywide's underwriting guidelines and the enforcement thereof defined the Company's risk profile and was of critical importance to its operations and its ability to sell loans to the secondary market. In fact, the quality of Countrywide's loans was the single most important aspect of its business and operations. As a lender that securitized and sold most of the loans it originated in the secondary market subject to repurchase obligations, the quality of Countrywide's loans subjected it to significant repurchase liability arising from its representations and warranties to the secondary market. Countrywide's loan

originations constituted the Company's core operations and formed the heart of its business.

4. Beginning in 2003, Countrywide embarked on an effort to overtake its competitors and capture a dominant share of the nation's residential loan market. The impetus for the growth – Countrywide's desire to capture ***"market dominance"*** with enormous and unprecedented 30% market share of the U.S. residential loan market – was announced in mid-2003 by defendant Angelo R. Mozilo ("Mozilo"), the Company's co-founder, Chairman and Chief Executive Officer ("CEO").

5. Notwithstanding concerns voiced by analysts and others that this sudden increase in loan origination might translate into a reduction in overall loan quality, the Company repeatedly assured the public and its investors that policies and procedures for underwriting loans—in essence, determining whether the borrower was likely to pay in full and on time—were tightly controlled and supervised and "designed to produce high quality loans." Countrywide repeatedly touted its prudent, conservative and risk-managed lending practices, diversified loan portfolio and a supposed high quality credit culture throughout the Relevant Period.[1] Countrywide also repeatedly stressed during this period that it had more stringent underwriting standards than others in the industry – something that the Company claimed set it apart from most mortgage originators and would allow it to weather, unscathed, any problems in the market. The Company represented to the public that it followed strict and disciplined appraisal and underwriting procedures, far superior to those of competing lenders and designed to produce high quality loans. In fact, the Company repeatedly represented that it offered "nonprime" loans only to the most sophisticated and creditworthy borrowers and that the majority of its loan portfolio consisted of less risky "prime" loans.

[1] For purposes of this Complaint, the Relevant Period shall mean the period between March 12, 2004 and March 7, 2008.

6. In fact, in 2007, as other lenders, notably subprime lenders, began to fail, Mozilo and other Countrywide officers continued to portray Countrywide as uniquely positioned to capitalize on any impending mortgage crisis because of its strict standards. Indeed, in March 2007, Defendant Mozilo stated in a CNBC interview that Countrywide would benefit from the tumult in the housing market. Defendant Mozilo boasted that “[t]his will be great for Countrywide . . . because at the end of the day, all of the irrational competitors will be gone.”

7. However, nothing could have been further from the truth. In fact, beginning in 2003, Countrywide had embarked on an aggressive corporate strategy to originate as many loans as possible, by increasingly underwriting and purchasing of subprime, nontraditional and risky mortgage products. These risky products included pay option adjustable rate mortgage (“Pay Option ARMs”) in which borrowers could select from among various monthly payments, including payments that neither paid down principal nor covered the full amount of interest, and home equity lines of credit (“HELOCs”), which were second-lien mortgages secured only by the difference between the value of a home and the amount due on a first mortgage, where the borrower’s equity in the financed property is reduced or non-existent. Countrywide's production of nontraditional mortgages increased substantially – both in absolute dollar amounts and as a percentage of the Company’s total mortgage origination.

8. The Company knew the risks of nontraditional mortgage lending in general, and about the risks associated with Pay Option ARM and HELOC programs in particular. Indeed, these nontraditional loans were the subject of regulatory guidance on nontraditional mortgage lending drafted and published jointly on October 4, 2006 by the Department of the Treasury Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, and Office of Thrift Supervision.[2] This

---

[2] *Interagency Guidance on Nontraditional Mortgage Product Risks*, 71 Fed. Reg.

guidance, which was transmitted to all CEO's of lending institutions, required institutions engaging in nontraditional lending to use heightened risk management to account for and guard against the increased risk of loan loss. Regulators provided specific guidance on the need to avoid asset concentrations, increase underwriting and credit qualification standards, and implement adequate controls to manage the heightened risks of nontraditional mortgages, particularly those with multiple or "layered risk" characteristics, such as loans made without verification of income or assets. The guidance also laid out the risks associated with these nontraditional loans, which by 2006 were already well-known to those engaged in the mortgage industry: (a) the risk of "payment shock" when the interest rate on a Pay-Option ARM resets, thereby increasing the monthly payment; (b) the risk of "negative amortization" with Pay Option ARMs in which unpaid interest amounts are added to the outstanding principal amount owed, thus increasing the overall loan balance; and (c) the substantial increased risk that a HELOC, especially during a "down" real estate market, might become unsecured and worthless in a default.

9. However, the Company further compounded the risks associated with its expanding nontraditional loan portfolio by engaging in practices that were in direct conflict with the *Interagency Guidance*.

10. The Company's push to book loans spiraled out of control and led to the creation of an improper incentive compensation system that encouraged lending personnel to make the riskiest loans regardless of the borrower's ability to repay. In sum, during the Relevant Period, Countrywide sacrificed loan ***quality*** for loan ***quantity*** in order to pump up loan production, charge extra fees and higher interest rates and boost its revenues. In fact, Countrywide could no longer

58,609, *et seq*. (Oct. 4, 2006) ("*Interagency Guidance*").

sell its loans to GSEs, but had to sell them to private institutional investors, with significant repurchase liability.

11. Against the backdrop of these risky practices, Defendants issued a variety of false and misleading statements regarding the Company's underwriting practices, its exposure to the subprime market and its financial results in violation of both federal and state laws.

12. With respect to its underwriting practices, defendants issued false and misleading statements regarding the fact that the Company was: (a) steadily loosening its underwriting standards to sweep in borrowers with poor credit; (b) making the vast majority of Pay Option ARMs on a "low doc" or "no doc" basis -- i.e. without any meaningful verification of income or assets; (c) further circumventing those already weakened underwriting criteria by approving "exception loans" -- i.e. loans which did not meet its underwriting criteria -- through the use of a computer system called the Exception Processing System ("EPS"), but only after charging these high risk borrowers extra points and fees; and (d) engaging in widespread predatory lending practices to steer many borrowers into subprime loans or other nontraditional loans, when they have qualified for conventional financing with lower rates.

13. To further conceal its greatly increased production of "subprime" loans (i.e. risky loans made to borrowers with poor credit), Countrywide employed an internal, undisclosed definition of "prime" versus "subprime", and, in its public reports, classified loans as prime that clearly were subprime. Additionally, the Company maintained that its Pay Option ARMs were prudently underwritten and that borrowers holding these loans were of the highest credit quality and had strong credit scores, when in fact many of these loans were made to borrowers with very weak credit.

14. Throughout the Relevant Period, Countrywide and the Officer Defendants also falsely and materially inflated Countrywide's assets, gain-on-sale

and reported net income in violation of Generally Accepted Accounting Principles ("GAAP"). Accounting rules required that Countrywide's allowance for loan losses ("ALL" or "loan loss reserves") accurately reflect the inherent risk of non-repayment in its portfolio of loans held for investment ("LHI"). These Defendants knowingly or recklessly ignored numerous "red flags" that indicated the substantial risks and mounting losses inherent in Countrywide's risk loan portfolio and failed, in violation of GAAP, to set aside sufficient reserves for the massive loan losses that would inevitably occur. For example, these Defendants refused to increase the Company's ALL even though they knew by September 2006 that 66% of borrowers were electing to make less than full interest payments on the Company's Pay Option ARM loans. By the end of the fiscal year ending December 31, 2006 ("FY 2006"), the Company had $654 million worth of accumulated negative amortization, compared to only $74.7 million at the end of the fiscal year 2005 ("FY 2005") and only $29 thousand in fiscal year 2004 ("FY 2004").[3]

15. Although this alarming growth in accumulated negative amortization should have been seen as an early warning sign, Defendants failed to adequately increase Countrywide's ALL to accurately reflect this known risk, thus dramatically widening the shortfall between Countrywide's actual loan losses and the amount that it set aside in its loan loss reserve and overstating Countrywide's reported earnings. Yet, notwithstanding the dramatic rise in the number of delinquencies that Countrywide experienced from its LHI, Defendants refused to properly increase the Company's ALL during the Relevant Period and instead

[3] At all relevant times, Countryside's fiscal year ran from January 1 through December 31. Accordingly, references to Countrywide's quarterly reporting periods are designated herein as "Q1" for January 1 – March 31, "Q2" for April 1 - June 30, "Q3" for July 1 - September 30, and "Q4" for October 1 – December 31.

kept its ALL at a relatively constant rate more suited for a conservative, traditional loan portfolio.

16. As the level of risk in Countrywide's LHI drastically increased, the Company kept the level of ALL relatively constant or even allowed it to decrease, knowing that to increase ALL would have a direct, dollar-for-dollar impact on the amount of earnings the Company could report in its financial statements. In addition to the failure to increase loan loss reserves, Countrywide also reported inflated earnings, in violation of GAAP, by overvaluing its valuation of retained interests ("RIs") and mortgage servicing rights ("MSRs") from loans sold to the secondary market; and by failing to properly reserve for representations and warranties ("R&Ws") it made to secondary market purchasers.

17. For its part, KPMG LLP ("KPMG") negligently or recklessly failed to comply with Generally Accepted Auditing Standards ("GAAS") in auditing Countrywide's financial statements for its FY 2004 through FY 2006, and thus participated in conveying materially false and misleading statements to the investing public.

18. In the midst this massive expansion effort, Countrywide made numerous debt offerings, for the purpose of raising capital to continue funding its loan origination operations. However, as described more fully below, the Underwriter Defendants (defined below) are responsible by statute for untrue statements included in registration statements and prospectuses for offerings of Countrywide debt securities purchased by Plaintiff during the Relevant Period.

19. Countrywide's risky scheme to artificially inflate earnings in the short term initially resulted in remarkable growth for the Company, with a seemingly booming business, a dominant market share and a stock price that, after trading under $20 for most of 2003, traded in the mid-$30s throughout most of the relevant time alleged in this Complaint and climbed to a high of $45 by early 2007.

20. However, starting on July 24, 2007, the Company's carefully spun web had begun to unravel. Countrywide announced a loan loss provision of $293 million attributable to deterioration in its loan portfolio and securities. The Company also had to write down, by $338 million, the value of retained interests on securitizations of HELOCs. The Company also revealed, in remarks during its quarterly conference call, that it had been misclassifying loans as "prime" that the industry would have viewed as "subprime" and that it had "recalibrated" its proprietary underwriting system and made changes to its underwriting guidelines and processes. On, July 27, 2007, Stifel Nicolaus issued a report sharply criticizing Countrywide's previous representations about its portfolio's exposure. The analyst stated that, "[g]iven the magnitude of the credit problems . . . we think [management] made serious miscalculations (and possibly misrepresentations) about the quality of the loans added to the bank."

21. As the truth continued to be revealed, it became clear that the Company had failed to adhere to its underwriting standards and was experiencing a dramatic increase in losses from bad loans. Countrywide made a series of additional, partially corrective disclosures about worsening problems in its mortgage portfolio (including an enormous and unprecedented $1.2 billion loss for the third quarter of 2007) and its inability to obtain capital. Stock market analysts began speculating that Countrywide might have to file for bankruptcy. As the Company's credit rating was downgraded and its credit facilities and other back up sources of liquidity dried up, Countrywide was faced with a liquidity crisis (the true depth of which was further hidden from its investors) that directly impacted Countrywide's ability to make more loans.

22. On January 11, 2008, amid rumors that Countrywide was preparing to commence bankruptcy proceedings, Bank of America, N.A. ("BofA") announced that it had entered into an Agreement and Plan of Merger to acquire Countrywide, at the bargain-basement price of $4 billion in stock, representing a

mere 26% of Countrywide's reported book value at that time. The merger with BofA was finalized on July 1, 2008. The full extent of Countrywide's corporate fraud was finally revealed a couple months later, on March 8, 2008, when *The Wall Street Journal* reported that "[t]he Federal Bureau of Investigation is probing . . . Countrywide Financial Corp. for possible securities fraud." According to *The Wall Street Journal*, the inquiry involves "whether senior officials made misrepresentations about the Company's financial position and the quality of its mortgage loans in securities filings."

23. Nearly all of Countrywide's growth in stock price from 2003 to 2007 was wiped out by this devastating collapse, with the stock price losing ***87%*** of its value between July 2007 and March 2008, from approximately $34 to $4 per share, as a result of the revelations of the truth concerning Countrywide. As a result of the wrongdoing herein alleged, Plaintiff lost millions of dollars on its investments in Countrywide publicly traded common stock and debt securities.

24. On August 14, 2007, George Pappas, on behalf of himself and all others similarly situated, filed suit against Countrywide and several individuals, alleging securities law violations. *See George Pappas v. Countrywide Financial Corp. et al.*, No. 07-CV-05295-MRP (C.D. Cal.). On November 28, 2007, U.S. District Judge Mariana R. Pfaelzer consolidated the *Pappas* action with several other cases involving publicly traded Countrywide securities, in *In re Countrywide Financial Corporation Securities Litigation*, No. CV 07-05295 MRP (MANx) (C.D. Cal.). Lead Plaintiffs therein filed a Consolidated Amended Class Action Complaint on April 14, 2008, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Sections 11, 12 and 15 of the Securities Act against Countrywide, certain of its current and former directors and officers, KPMG and underwriters of public offerings of Countrywide securities. Judge Pfaelzer granted class certification on December 9, 2009 and preliminarily approved a class settlement on August 2, 2010. Plaintiff opted out of the Class Action by

filing a notice on October 18, 2010, the deadline set by Judge Pfaelzer for opting out of the class action. On January 7, 2011, Judge Pfaelzer granted preliminary approval to a First Amendment to the Settlement Agreement.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to Section 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a); and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5; Sections 25500 and 25501 *et seq.* of the California Corporations Code for violations of Sections 25400 and 25401 of the Cal. Corp. Code; Sections 1709-1710 of the Cal. Civ. Code; and Section 17200 *et seq.* of the Cal. Bus. & Prof. Code.

26. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §§1331 and 1367.

27. Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §1391(b), (c)-(d). Many of the acts and omissions charged herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in substantial part in the Central District of California. At all relevant times, Countrywide maintained its corporate headquarters and principal executive offices in this District and did so throughout the Relevant Period.

28. In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchange.

29. This action is not preempted by the Federal Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353 (1998) ("SLUSA"), because: (a) this action is brought solely by a "State Pension Plan" as that term is defined in SLUSA, and Plaintiff has authorized its participation in this action; and (b) this action is not a class action or an action brought by a representative party and does not seek damages on behalf of more than fifty persons.

## III. THE PARTIES

### A. Plaintiff

30. Plaintiff Fresno County Employees' Retirement Association is an entity formed under the State of California's County Employees' Retirement Law of 1937. FCERA invests funds for the exclusive purpose of providing retirement compensation, death benefits and disability benefits to participants in the pension or retirement system for Fresno County employees and their beneficiaries. FCERA manages over $2.8 billion in assets. Pursuant to its investment authority over the managed funds, FCERA purchased and sold shares and debt securities of Countrywide during the Relevant Period, including, but not limited to, the transactions set forth in Exhibit A attached hereto.

### B. Defendants

#### 1. Countrywide

31. Defendant Countrywide is, and at all relevant times herein was, a corporation organized and existing under the laws of the State of Delaware. During the Relevant Period alleged in this Complaint, Countrywide maintained its principal executive offices located at 4500 Park Granada, Calabasas, California. Countrywide was founded in March 1969 and engaged, itself and through its subsidiaries and segments, in mortgage lending and other finance-related businesses, including mortgage banking, retail banking and mortgage warehouse lending, securities dealing, insurance underwriting and international mortgage loan

processing and servicing. Countrywide common stock has traded actively on the New York Stock Exchange (the "NYSE") since October 1985.

32. Defendant Countrywide Home Loans, Inc. ("CHL") is, and at all relevant times herein was, a New York corporation that was a direct wholly owned subsidiary of Countrywide, created for the purpose of originating and servicing residential home mortgage loans. During the Relevant Period, CHL maintained its principal place of business at 4500 Park Granada, Calabasas, California.

33. Pursuant to an Agreement and Plan of Merger by and between Countrywide and BofA dated as of January 11, 2008, Countrywide merged with and into Red Oak Merger Corporation ("Red Oak"), a Delaware corporation and wholly owned subsidiary of BofA, on or about July 1, 2008 (the "Merger"). Upon consummation of the Merger, Red Oak (as the surviving Merger subsidiary) changed its name to Countrywide Financial Corporation, and under the direction of BofA, it continues to operate Countrywide's mortgage business.

**2. The Officer Defendants**

34. Defendant Angelo R. Mozilo was the co-founder of the Company which was formed in 1969 and was a member of its Board of Directors (the "Board") and served in various executive capacities since its formation, including serving as President of the Company from March 2000 through December 2003. Mozilo was Chairman of the Board from March 1999 until the Merger and CEO from February 1998 until the Merger. Mozilo was also a Director of CHL at certain points during the relevant period. Mozilo is a resident of Ventura County, California and has often transacted business in California, including his responsibilities as Chairman of the Board and CEO of Countrywide. Mozilo signed the Company's Annual Reports on Form 10-K for and from 2003 through 2006 filed with the SEC and accompanying certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), SOX certifications accompanying the Company's Quarterly Reports on Form 10-Q filed with the SEC for and from the

first quarter of 2004 through and including the third quarter of 2007, SOX certifications for the 10-Q/Amended Quarterly Reports for the first and second quarter of 2004 and the Company's Form S-3 filed with the SEC on April 7, 2004.

35. Defendant David Sambol ("Sambol") joined Countrywide in 1985 and became the Company's President and Chief Operating Officer ("COO") in September 2006 and a member of the Board from 2007 through the Merger. Prior to that, from 2004 to 2006, Sambol served as Executive Managing Director for Countrywide's Business Segment Operations, leading all revenue-generating operations of the Company, as well as the corporate operational and support units comprised of Administration, Marketing and Corporate Communications, and Enterprise Operations and Technology. Sambol also served as Chairman and CEO of the Company's principal operating subsidiary, CHL, from 2007 until the Merger, and from 2004 through 2006, Sambol was President and COO of CHL. Sambol was also a Director of CHL at certain points during the relevant period. Sambol is a resident of Los Angeles County, California and has often transacted business in California, including his responsibilities as President and COO of Countrywide. Sambol signed the Company's Quarterly Reports on Form 10-Q filed with the SEC for and from the third quarter 2006 through and including the third quarter of 2007.

36. Defendant Eric P. Sieracki ("Sieracki") served as the Company's Executive Managing Director and Chief Financial Officer ("CFO") and as CFO of Countrywide Bank from April 2005 until the Merger, and was a member of the Executive Strategy Committee. Sieracki was responsible for oversight of Countrywide's major financial departments, including corporate accounting, treasury, financial planning, strategic planning and taxation. He also served as the Company's senior manager in the areas of investor relations, corporate development and equity capital activities. Sieracki joined the Company in 1988 as Senior Vice President of Countrywide Asset Management Corporation and has

held a number of executive positions. In 1989, he was promoted to Executive Vice President of Corporate Finance, in charge of finance and accounting responsibilities for Countrywide and its subsidiaries. Sieracki was also the Senior Managing Director and CFO (Principal Financial and Accounting Officer) of CHL at certain points during the relevant period. Sieracki is a resident of Los Angeles County, California and has often transacted business in California, including his responsibilities as Executive Managing Director and CFO of Countrywide. Sieracki signed the Annual Reports on Form 10-K for 2005 and 2006 filed with the SEC and accompanying SOX certifications, Quarterly Reports on Form 10-Q for and from the first quarter of 2005 through and including the third quarter of 2007 and accompanying SOX certifications, Form 10-Q/A Amended Quarterly Reports for the first and second quarters of 2004 and accompanying SOX certifications.

37. Defendant Stanford L. Kurland ("Kurland") joined Countrywide in 1979 and became COO in 1988 and President in January 2004. Kurland remained President and COO of Countrywide until his resignation on September 7, 2006. Kurland served in a number of other executive positions at the Company, including Executive Managing Director from 2000 to 2003 and Senior Managing Director from 1989 to 2000. He was also a member of the Board of the Company from 1999 until his resignation. From 2004 through 2006, Kurland was CEO and Chairman of the Board of Directors of CHL. Kurland is a resident of Los Angeles County, California and has often transacted business in California, including his responsibilities as President and COO of Countrywide. Kurland signed the Company's Annual Reports on Form 10-K filed with the SEC for 2003, 2004 and 2005; Quarterly Reports on Form 10-Q for and from the first quarter of 2004 through and including the second quarter of 2006; Form 10-Q/A Amended Quarterly Reports for the first and second quarters of 2004; the Company's Form

S-3 filed with the SEC on April 7, 2004. Kurland also signed Form 8-Ks filed with the SEC on April 21, 2004 and July 26, 2004.

38. Defendants Mozilo, Sambol, Sieracki and Kurland (collectively, the "Officer Defendants"), by virtue of their high-level positions with Countrywide, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition during their tenure with the Company as alleged herein. As set forth below, the information conveyed in the Company's SEC filings, press releases and other public statements was the result of the collective actions of these individuals. Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing and/or disseminating the statements at issue in this case, approved or ratified these statements or was aware or recklessly disregarded that these statements were being issued regarding the Company. Accordingly, it is appropriate to treat the Officer Defendants as a group for pleading purposes.

39. As officers and directors of a publicly held company whose common stock and other securities were registered with the SEC pursuant to the Exchange Act, and whose common stock was traded on the NYSE, and governed by federal securities laws, the Officer Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's business, operations, financial statements and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. The Officer Defendants each violated these requirements and obligations.

40. The Officer Defendants, because of their positions of control and authority as senior executive officers and/or directors of Countrywide, were able

to and did control the content of the SEC filings, press releases and other public statements issued by Countrywide during the Relevant Period. Each of these individuals was provided with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Thus, each of the Officer Defendants is responsible for the accuracy of the public statements detailed herein.

41. The Officer Defendants, because of their positions of control and authority as senior executive officers and/or directors of Countrywide, had access to the adverse undisclosed information about Countrywide's business, operations, financial statements and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations by or about Countrywide materially misleading.

42. Countrywide and each Officer Defendant is liable as a participant in a scheme and course of business that operated as a fraud or deceit on Plaintiff and its agents as purchasers of Countrywide securities, including the making of false and misleading statements and/or concealing and omitting material adverse facts. The scheme and course of business: (a) deceived Plaintiff regarding the true nature of Countrywide's risky nontraditional loan portfolio and failure to follow its underwriting guidelines and policies; (b) deceived Plaintiff regarding the adequacy of Countrywide's loan loss reserves underlying the valuation of the Company's RIs, MSRs and LHI; (c) artificially inflated the price of Countrywide's stock and other debt securities; and (d) caused Plaintiff and its agents to purchase and hold Countrywide stock and other debt securities at artificially inflated prices. These Defendants disseminated and approved these false and misleading statements, including statements with material omissions,

regarding the Countrywide's actual earnings and financial condition, as well as Countrywide's predicted earnings and growth for several fiscal years prior to the Merger. Those statements were made in public filings with the SEC, public statements, press releases, and comments to Wall Street analysts, among others, as set forth below and throughout this Complaint.

**3. Additional Individual Defendants**

43. Defendant Henry G. Cisneros ("Cisneros") was a member of Countrywide's Board from 2001 until October 24, 2007. Cisneros signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

44. Defendant Jeffrey M. Cunningham ("Cunningham") was a member of Countrywide's Board from 1998 until the Merger. Cunningham signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

45. Defendant Robert J. Donato ("Donato") was a member of Countrywide's Board from 1993 until the Merger. Donato signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

46. Defendant Michael E. Dougherty ("Dougherty") was a member of Countrywide's Board from 1998 until March 28, 2007. Dougherty signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

47. Defendant Ben M. Enis ("Enis") was a member of Countrywide's Board from 1984 until June 2006. Enis signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004 and 2005.

48. Defendant Carlos M. Garcia ("Garcia") was Countrywide's Executive Managing Director for Banking and Insurance. Garcia was the Senior

Managing Director, Chief of Banking & Insurance Operations and a Director of CHL during the relevant period. Garcia signed the Company's Form S-3 filed with the SEC on April 7, 2004.

49. Defendant Edwin Heller ("Heller") was a member of Countrywide's Board from 1993 until June 2006. Heller signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004 and 2005.

50. Defendant Gwendolyn Stewart King ("King") was a member of Countrywide's Board from 2001 until November 15, 2004. King signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Report on Form 10-K for 2003.

51. Defendant Martin R. Melone ("Melone") was a member of Countrywide's Board from 2003 until the Merger. Melone signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

52. Defendant Oscar P. Robertson ("Robertson") was a member of Countrywide's Board from 2000 until the Merger. Robertson signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

53. Defendant Keith P. Russell ("Russell") was a member of Countrywide's Board from 2003 until the Merger. Russell signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

54. Defendant Harley W. Snyder ("Snyder") was a member of Countrywide's Board from 1991 until the Merger. Snyder signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

55. The Defendants named in this section are collectively referred to herein as the "Individual Defendants."

**4. Underwriter Defendants**

56. Defendant Banc of America Securities LLC ("Banc of America") is headquartered in New York and acted as an underwriter with respect to offering of Series A Medium-Term Notes.

57. Defendant J.P Morgan Securities Inc. ("J.P. Morgan") is headquartered in New York and acted as an underwriter with respect to offerings of Series A Medium-Term Notes and Series M Medium-Term Notes.

58. Defendant Countrywide Securities Corporation ("CSC") is headquartered in North Carolina and acted as an underwriter with respect to the offering of Series A Medium-Term Notes.

59. Defendant Barclays Capital Inc. ("Barclays") is headquartered in New York and acted as an underwriter with respect to the offering of Series A Medium-Term Notes.

60. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is headquartered in New York and acted as an underwriter with respect to the offering of Series A Medium-Term Notes.

61. Defendant HSBC Securities (USA) Inc. ("HSBC Securities") is headquartered in New York and acted as an underwriter with respect to the offering of Series A Medium-Term Notes.

62. Defendant Wells Fargo Securities, LLC, formerly known as Wachovia Capital Markets, LLC ("Wells Fargo Securities"), is headquartered in North Carolina and acted as an underwriter with respect to the offering of Series M Medium-Term Notes.

63. Defendant RBS Securities Inc., formerly known as Greenwich Capital Markets, Inc. ("RBS Securities"), is headquartered in Connecticut and

acted as an underwriter with respect to the offering of Series A Medium-Term Notes.

64. Defendant Citigroup Global Markets Inc. ("Citigroup") is headquartered in New York and acted as an underwriter with respect to offerings of Series A Medium-Term Notes and Series M Medium-Term Notes.

65. Defendant RBC Capital Markets Corporation ("RBC Capital") is headquartered in New York and acted as an underwriter with respect to offerings of Series A Medium Term Notes and Series M Medium-Term Notes.

66. Defendant ABN AMRO Incorporated ("ABN AMRO") is headquartered in Illinois and acted as an underwriter with respect to the offering of Series M Medium-Term Notes.

67. Defendant BNP Paribas Securities Corp. ("BNP Paribas") is headquartered in New York and acted as an underwriter with respect to the offering of Series M Medium-Term Notes.

68. The Defendants named in this Section are collectively referred to herein as the "Underwriter Defendants."

**5. KPMG**

69. Defendant KPMG LLP is, and at all relevant times herein was, a public accounting firm with offices throughout the United States, including in California. KPMG maintains its national headquarters at 345 Park Avenue, New York, New York. KPMG served as Countrywide's outside auditor starting in January 2004. KPMG provided audit, audit-related, tax and other services to Countrywide, which included the issuance of unqualified opinions on the Company's financial statements for the years ended December 31, 2004, 2005 and 2006, and opinions of management's assessments of internal controls for years ended December 31, 2004[4], 2005and 2006.

[4] KPMG identified one material weakness in the Company's internal controls over financial reporting for the year ended December 31, 2004.

## IV. BACKGROUND REGARDING COUNTRYWIDE'S BUSINESS

### A. Countrywide's Business

70. For many years, Countrywide was known as one of the largest mortgage lenders in the United States. This reputation was built on years of offering customary fixed-rate first-lien mortgage loans (also known as "traditional" loans) to borrowers. Historically, Countrywide's primary business had been originating traditional loans that could be sold to the GSEs, such as Fannie Mae and Freddie Mac, i.e., conforming loans.[5] In 2002, nearly 60% of all loans written by Countrywide were conforming loans, as compared to only about 25% non-conforming for that same period.

71. Countrywide's primary business segment, Mortgage Banking, was responsible for originating, purchasing, selling and servicing non-commercial mortgages across the nation. Countrywide had different divisions within Mortgage Banking which handled various loan origination and purchasing functions, including the Correspondent Lending Division ("CLD") (loan purchasing), Full Spectrum Lending Division ("FSL") (subprime loan origination), the Wholesale Lending Division ("WLD") (wholesale loan origination and purchasing) and the Consumer Markets Division (retail loan origination).

72. Four other business segments provided interrelated services to the Mortgage Bank segment: (a) Banking, which operated a federally registered institution that took deposits, originated some loans and invested in mortgages and HELOCs; (b) Capital Markets, which operated an institutional broker-dealer specializing in underwriting and trading mortgage-backed securities ("MBS"); (c) Insurance, which provided property, casualty, life and disability insurance to homeowners as well as reinsurance coverage to primary mortgage insurers; and

[5] Conforming loans were considered safer investments for lenders because they were subject to maximum loan amounts, debt-to-income ratio limits and documentation requirements.

(d) Global Operations, which licensed proprietary software to mortgage businesses abroad.

73. The three largest business segments, Mortgage Banking, Banking and Capital Markets, worked together and fed off of the loan origination and purchase process, to generate well over 90% of Countrywide's pre-tax earnings by 2006. Some of the loans originated or acquired by Mortgage Banking were held for investment by the Banking Division, and the rest were sold off through securitizations and other wholesale arrangements by Capital Markets.

74. Countrywide pooled most of the loans it originated and purchased, and sold them in market transactions (referred to as the "secondary market"), either through whole loan sales or securitizations. In whole loan sales, loans are pooled and sold in bulk to investors (or other banks who, in turn, might have securitized the loans themselves), and the seller records gains on the sales. In securitizations, loans are pooled together and transferred to a trust controlled by the securitizer. The trust then creates and sells MBS. Holders of MBS receive the right to a portion of the monthly payment stream from the pooled loans.

75. During the Relevant Period, Countrywide generated massive revenues through the sale of loan pools and securitizations. The price paid by purchasers of securitizations or pools of whole loans varied based on the demand for the particular types of loans described in the sale. The stated characteristics of the loans, such as whether the loans were prime or subprime, had adjustable or fixed interest rates or included a prepayment penalty, all influenced the price. Various loans, such as subprime, earned greater prices or "premiums," in the secondary market because the higher interest rates and prepayment penalties associated with these loans resulted in a higher expectation of income stream.

76. Even though Countrywide sold most of its loans, it often retained the right to service these loans, which generated additional profits for Countrywide.

Countrywide also earned profits by retaining an interest in any payment streams not sold to MBS holders.

77. Countrywide had significant short- and long-term financing needs to continue originating and purchasing loans, and then selling them to the secondary market. Short-term financing needs (such as the cost of warehousing loans pending sale and trading activities for MBS) were met through unsecured commercial paper and medium-term notes, asset-backed commercial paper, revolving lines of credit, short-term repurchase agreements, unsecured subordinated debt, junior subordinated debt and deposit-gathering. By contrast, long-term financing needs (such as capital needed to originate and purchase loans and invest in MSRs and RIs) were funded by the profits earned from secondary market sales. According to Form 10-K reports filed by Countrywide during the Relevant Period, Countrywide's primary business objective was to ensure "ongoing access to the secondary market by producing high quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards."

## B. Countrywide Started To Produce More Nontraditional and Far Riskier Loan Products

### 1. Countrywide Sought To Gain Market Dominance

78. Because revenues from the sale of loans became such a large portion of Countrywide's revenues by the start of the Relevant Period, the success of Countrywide's ongoing operations was dependent on its ability to originate and purchase loans that could be sold to the secondary market. Beginning in mid-2003, Countrywide, led by Mozilo and Sambol, was intent on elbowing out competing lenders that tried to hone in on Countrywide's share of the residential home loan market. According to a February 23, 2008 article in WSJ, tensions between Sambol, who was emerging as a major force within the Company, and Countrywide's risk managers, as to the best strategy to grow Countrywide's

business, boiled over at a meeting of dozens of executives in the Company's headquarters. According to the article, the conflicts regarding how to grow the business were resolved as Sambol succeeded in imposing a new Company-wide "mandate" to originate more "non-conforming" loans to increase loan production across the board.

79. Mozilo quickly embraced Sambol's plan to turn Countrywide into the largest mortgage originator in terms of volume. During a conference call with analysts on July 22, 2003, Mozilo stated that his goal for the Company was "to ***dominate*** the purchase market and to get our overall market share to the ultimate 30% by 2006, 2007[.]" Mozilo reiterated during a January 27, 2004 conference call that "[o]ur goal is ***market dominance***[6], and we are targeting 30% origination market share by 2008 to support our macro hedge strategy."

80. As Countrywide's reported production figures show, Countrywide had in fact moved away from its historical core business of underwriting conforming loans. As reported in Countrywide's periodic filings and reflected in the chart below, in 2004, 2005 and 2006, Countrywide originated more non-conforming loans than in any prior period:

| | **2002** | **2003** | **2004** | **2005** | **2006** |
|---|---|---|---|---|---|
| **Prime Conforming as % of Total Loans Originated** | 59.6% | 54.2% | 38.2% | 32% | 31.9% |
| **Prime Non-Conforming as % of Total Loans Originated** | 24.5% | 31.4% | 38.7% | 47.2% | 45.2% |

81. Numerous Confidential Witnesses ("CWs") from different levels and involved in different aspects of the Company corroborate the dramatic nature of Countrywide's strategy shift from traditional to high-risk mortgage lender. CW1,

[6] Except as otherwise noted herein, all emphasis is added.

a Countrywide regional vice-president of sales for several mid-Atlantic states from September 2002 to May 2007, who supervised 170 employees in nine offices, stated that he received daily e-mails from Countrywide's National Director of Sales, Scott Bridges, to increase sales of non-conforming loans and thereby increase their region's ranking among the others in the Company. According to this witness, "the real pressure came from above." By increasing the origination of non-conforming loans, Countrywide was able to originate many more loans each year and, because non-conforming loans were riskier than conforming loans, Countrywide was able to charge borrowers higher fees when extending such loans.

82. CW2, a senior loans specialist from 2001 to 2004 and a branch operations manager from 2004 to 2007, corroborates that Scott Bridges sent out FSL Notify, a notification via email kept in an Excel spreadsheet which ranked all of the branches according to their progress in meeting their goals which were based on the number of loans sold, from the "top dogs to the lowest on the totem pole." These rankings were stored in the Company's Lotus Notes-based system and were accessed through a page called "Inside the Spectrum." This ranking usually came with some sort of message attached lauding those who made their numbers or urging improvements in others. Also, the notifications were often accompanied or followed by unscheduled audio recordings sent via email from Mozilo himself, urging employees to follow certain directives. "Out on the floor (where the loan officers sat), they would talk about meeting the units," CW2 said, referring to the number of loans set as a goal each month. "It was all about making the units." According to a branch manager in the FSL division, CW3, Countrywide increased its Company-wide loan origination goal five-fold, from $1 billion per month in 2004 to $5 billion per month by 2007.

83. Another senior loans specialist and branch operations manager from 2004 to 2007, CW4, corroborates that Mozilo "kept his finger on the pulse" of the Company's bottom line by sending out these emails stating the volume of loans

that had been made in a month and setting goals for the next month. According to CW4, "Countrywide [became] known in the business as a sweatshop." During the last few months of CW2's employment, in the summer of 2007, Mozilo sent several messages urging employees to make more subprime loans, which were among the most profitable products the Company sold. CW5, another operations manager in Billings, Montana from April 2000 to February 2007, recalled that the emails were personalized and worded something like: "Angelo [Mozilo] wants you to tell customers about a great new program to promote to realtors to help homebuyers get into more house." CW6, who was a Senior Vice President and Credit Risk Director in 2006 and 2007 at Countrywide's office in Plano, Texas, recalls Mozilo complaining in a meeting during a visit that the Plano office was not originating loans quickly enough. Mozilo asked the rhetorical question, "How come I can go out and buy a new Bentley for $175,000 in 45 minutes and it takes me 30 days to buy a house?"

84. In addition, Countrywide directly and indirectly motivated its branch managers, loan officers and brokers to underwrite and approve more loans, irrespective of their suitability for the borrowers. CW2 stated that what motivated employees was the pressure to make their goals. "The pressure was on to make the units. The branch manager would have Friday morning meetings and offer $50 gift cards and lunch to the teams that sold the most." According to this witness, management placed Countrywide's lending divisions and underwriters under constant pressure to approve increasing quantities of loans. In a WSJ article on October 24, 2007 (written after the truth regarding Defendants' wrongdoing started to emerge) (the "October 24, 2007 WSJ Exposé"), another employee of Countrywide confirmed that Countrywide regularly encouraged employees to sell more loans by offering prizes, such as trips to Hawaii, to top-producing employees.

85. CW2 also explained that branch managers had specific goals to meet every month in terms of the number of loans—or "units"—the branch made and

the revenue it made. Countrywide's branch managers recorded the loans in process—and their status such as applied, submitted, approved and funded—in a software program that could be viewed in real time by Countrywide's senior management. To assess the branch's progress towards meeting the goals that were set—and they varied from one month to the next from 40 to 50 to 60 loans—the Company's regional vice president reviewed the numbers mid-month and at the end of the month. The branch managers then put pressure on the loan officers and account executives to make the numbers in order to earn commissions. CW4, a branch operations manager, confirmed that "[l]oan officers were told to get a loan no matter what, get a deal. That's all it was about—the numbers."

86. Countrywide's strategy to put loan production into overdrive appeared to work, at least at first. According to the October 24, 2007 *Wall Street Journal* Exposé, Pay Option ARM loans originated by Countrywide "accounted for $93 billion, or 19%, of the company's loan volume by 2005, making it the top option ARM lender that year." Countrywide originated over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007. Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006, respectively. In 2005, Countrywide reported $451.6 million in pre-tax earnings from Capital Markets sales, representing 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in pre-tax earnings from that division, representing 12.8% of its pre-tax earnings. In its 2006 annual report, Countrywide trumpeted the fact that, "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

### 2. Countrywide Began Offering A Wide Array Of Nontraditional and Riskier Mortgage Products

87. At the same time that Countrywide began to put loan production into overdrive, Countrywide also altered its loan mix significantly, shifting from issuing traditional fixed-rate mortgages to borrowers with prime credit scores, to issuing more nontraditional, higher-risk loans, designed to allow borrowers, often those with blemished credit, to borrow more money than would be available under the Company's pre-2003 fixed-rate conforming loan business model.

88. Countrywide's nontraditional mortgages primarily featured ARMs, which are characterized by an initial interest rate that is lower than that of a fixed rate mortgage, for a predetermined introductory period. The interest rate resets at the end of the introductory period, depending on the economic index to which the rate is linked. According to CWs 6 and 7, who were both branch managers, Countrywide offered two principal ARM programs, 2-28 and 3-27, meaning that the teaser rate would last for only 2 or 3 years, and then reset for the next 28 or 27 years. This translated into an increased monthly payment for the balance of the loan. Countrywide's ARM programs also included pre-payment penalties, so that if the borrower re-financed before the end of the introductory rate period (and avoid the increased monthly payments), the borrower would have to pay a penalty to Countrywide.

89. Countrywide's ARM products also included Pay Option ARMs, which permitted a borrower to select from among various monthly payments, including payments that neither paid down principal nor covered the full amount of interest due in a given month. The range of monthly payment options, from high to low dollar amounts, were: (a) a payment based on a loan that was fully amortized over a particular number of years (e.g., a standard 30-year mortgage); (b) an "interest only" payment that did not include any principal pay down; and (c) a set "minimum monthly payment" that did not cover either the monthly principal amount or the monthly interest owed on the loan. Under this loan, if a

borrower selected to pay only the minimum monthly payment, which deferred payment of both principal ***and*** interest, the loan would begin a process of "negative amortization" in which the unpaid interest is added to the outstanding principal amount owed, thus increasing the overall loan balance.

90. As described in the Company's filings, under Countrywide's Pay Option ARM program, there were limits on the amount of missed interest that could be rolled into the principal balance. So, in addition to the reset that occurred at the end of the introductory ARM period described above, loan payments for Pay Option ARMs were re-calculated when the loan balance increased to 110%-125% of the original loan as a result of negative amortization. At that point, the loan was "recast" and expected to be repaid on a fully-amortized basis over the remaining term.

91. Countrywide also offered loan programs that reduced or eliminated the need for any documentation to prove loan applicants' income and/or assets, i.e., "low-doc" and "no-doc" loans. These types of loans were originally intended for professionals and business owners with high credit scores, who preferred not to disclose their confidential financial information every time they applied for a mortgage. However, the lack of verification made these loans particularly simple targets for borrowers to lie about their income or assets in order to qualify for a loan.

92. Another nontraditional loan product offered by Countrywide was the HELOC, which is a second mortgage secured by the home that is in junior position to the first mortgage. In addition to taking out a "primary" mortgage loan for the traditional maximum of 80% of the property's value, some borrowers take out a HELOC (referred to in the mortgage industry as a "piggyback loan") for as much as the remaining 20% of the purchase price, to avoid having to purchase private mortgage insurance that would otherwise be required.

93. Countrywide could charge higher interest and fees for HELOCs, making HELOCs very attractive to Countrywide. According to a UBS survey reported in the October 24, 2007 *Wall Street Journal* Exposé:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and offered "piggyback mortgages," which allow borrowers to finance more than 80% of a home's value without paying for private mortgage insurance. By 2006, nearly 29% of the option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

94. Countrywide viewed Pay Option ARMs as especially lucrative in the short term because investors were willing to pay more for securities backed by Pay Option ARMs than for those backed by traditional mortgages and guaranteed by a GSE. The stated characteristics of the loans, such as whether the loans were prime or subprime, had adjustable or fixed interest rates or included a prepayment penalty, all influenced the price. The reason investors preferred subprime MBS was the potential for increased payment stream from the higher interest rates charged for these loans, and the lower risk of early repayment because of built-in prepayment penalties. According to CW8, who was Vice President and Regional Operations Manager for Countrywide's WLD in the Southwest from 2005 until October 2007, Countrywide would "do everything" in terms of buying risky loans that it could then package and sell. "There was such a demand for high loan-to-value Alt-A paper[7] throughout 2005 and 2006," CW8 said, "they were giving Wall Street what they wanted."

---

[7] Alt-A, or Alternative-A loans, are mortgages that have a risk profile greater than prime mortgages (or A paper) but less than subprime. A key feature of Alt-A loans is that many times they are given to people who are unable or unwilling to verify their income or assets. Because lenders often do not ask for this type of verification, potential borrowers often lie about their income and assets in order to secure the loan. For this reason Alt-A mortgages are sometimes given the nickname "NINA" loans: No Income, No Assets.

95. In fact, Countrywide directly tied its loan originations to the appetite of potential purchasers of loan pools and MBS. According to an FSL branch manager, CW7, Countrywide had a system called CLUES or the "Countrywide Loan Underwriting Evaluating System." The CLUES system contained guidelines for loans that outside investors like Lehman Brothers wanted to purchase. Loan officers received "black box updates" from the CLUES system, signifying that investors had changed their guidelines for the types of loans they wanted to buy from Countrywide. Loan officers were expected to originate loans that met these purchaser guidelines. Another FSL branch manager, CW3, corroborates that all of FSL's loan programs were designed based on Wall Street's appetite to buy the loans. "Whoever designed them, we ran with it because Wall Street was buying it."

96. By offering nontraditional loans like Pay Option ARMs, HELOCs and reduced documentation loans, Countrywide was not only able to increase its market share, it also earned a significant profit from the higher fees that borrowers paid for those loans and the higher prices investors were willing to pay for loan pools and securitized assets on the secondary market. As reported in Countrywide's periodic filings and reflected in the chart below, in 2004, 2005 and 2006, Countrywide originated more ARMs, HELOCs and subprime mortgages (as that term was defined by Countrywide) than in any prior period:

| | **2002** | **2003** | **2004** | **2005** | **2006** |
|---|---|---|---|---|---|
| **Adjustable Rate Loans as % of Total Loans Originated** | 14% | 21% | 52% | 52% | 45% |
| **HELOC as % of Total Loans Originated** | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |
| **Nonprime (Subprime) as % of Total Loans Originated** | 3.7% | 4.6% | 11.0% | 8.9% | 8.7% |

97. When challenged about the ramifications such massive growth might have on loan quality, on July 22, 2003 Mozilo assured the market: "Going for 30% mortgage share here is ***totally unrelated to quality of loans we go after. . . .*** There will be ***no compromise*** by this company in the overall quality of the product line, you know, which manifests itself in your delinquencies and foreclosures, but we don't compromise on that as we grow market share, nor is there a necessity to do that." Unfortunately, this was not a true statement.

98. As alleged below, defendants misled investors in a number of ways regarding the impact of the Company's massive growth and shift from more conservative loans on the Company's financial results and future prospects in a number of ways. First, contrary to their assertions, the Company failed to adhere to strict underwriting standards and, thus, did not ensure that the loans they originated were of high quality. To the contrary, defendants loosened and deteriorated Countrywide's loan origination and underwriting standards and permitted an explosion of "exceptions" under those standards. Second, they concealed the fact that Countrywide was classifying many loans as "prime" that failed to meet the requisite industry definitions for that term, which rendered their statements about its subprime exposure false and misleading. Third, they failed to properly increase the Company's loan loss reserves to reflect the increased risk in its portfolio.

## V. COUNTRYWIDE DID NOT MAINTAIN OR APPLY STRONG UNDERWRITING STANDARDS OR PROPERLY INCREASE LOAN LOSS RESERVES TO ACCOUNT FOR THE INCREASED RISKS ASSOCIATED WITH ITS LOAN PORTFOLIO PARTICULARLY AS THE MARKET STARTED TO DECLINE

### A. Countrywide's Risk and Liquidity Exposure Increased

99. At the same time that Countrywide began its aggressive push into higher risk, nontraditional mortgages, macroeconomic considerations were generally making mortgage lending an increasingly risky business. The residential real estate market began to experience a retreat from the unprecedented

price spikes of the housing bubble that peaked in 2005, with real estate prices declining at an increasingly rapid pace from 2006 through the end of the Relevant Period. Also during this time, home foreclosures were increasing to historic levels.

100. By 2005, mortgage and banking industry regulators considered lending that employed the above-described loan products and other combinations of heightened risk factors (known as "layered risk" or "risk-layering") to be particularly risky lending practices and required that institutions engaging in such practices use heightened risk management including: (a) maintaining stringent underwriting standards; (b) limiting concentrations of risks; (c) limiting third-party loan originations; (d) ratcheting up the level of monitoring and stress testing of nontraditional mortgage portfolios; and (e) increasing allowances for loan and lease losses to adequately account for the heightened risks inherent in nontraditional mortgage loan portfolios, particularly those with risk-layering characteristics.

101. The increasing issuance of Pay Option ARM loans, including those with "layered risk" characteristics, prompted an interagency group of federal bank regulators to jointly draft and publish, on October 4, 2006, the *Interagency Guidance,* "to address risks associated with the growing use of mortgage products [like Pay Option ARM loans] that allow borrowers to defer payment of principal and, sometimes, interest." The proposed guidance was first issued in December 2005, and Countrywide provided detailed written comments to the regulators on March 27, 2006. The proposed guidance, and later the *Interagency Guidance*, sent a clear message to the market that bank regulators were concerned about generally lax underwriting standards and risk management practices of subprime lenders. The Office of Thrift Supervision sent a copy of the *Interagency Guidance* and supplemental information (which all officers were required to be

familiar with) to Mozilo on October 10, 2006, as acknowledged in the Company's public filings.

102. Industry consensus was that, while Pay Option ARM loans could be appropriate for a small portion of the population, such as well-qualified borrowers with high credit scores who intended to hold a mortgage for a short period of time or borrowers with verifiable employment or self-employment whose income tended to spike from month to month or year to year, such mortgages were not appropriate for most borrowers. Concerned with institutions' increasing reliance on "reduced documentation [lending practices], particularly unverified income to qualify borrowers for nontraditional mortgage loans," the *Interagency Guidance* warned:

> Because these practices essentially substitute assumptions and unverified information for analysis of a borrower's repayment capacity and general creditworthiness, they should be ***used with caution.*** As the level of credit risk increases, the Agencies expect an institution to more diligently verify and document a borrower's income and debt reduction capacity. . . . For example, stated income should be accepted only if there are mitigating factors that clearly minimize the need for direct verification of repayment capacity. For many borrowers, institutions generally should be able to readily document income using recent W-2 statements, pay stubs, or tax returns.

103. In fact, the notion that low or no documentation loans—particularly when coupled with "nontraditional" mortgages—are likely to contain material misrepresentations and/or fraud that will result in increased default rates was nothing new to the industry. For instance, in August 2006, WSJ ran an article stating:

> Banking regulators say that lenders are increasingly relying on unverified income to qualify borrowers for so-called nontraditional mortgage loans. Those products -- such as Pay Option adjustable-rate mortgages and interest-only loans -- allow borrowers to defer payment of principal and sometimes interest. ***Many analysts see such a combination of nontraditional products and nontraditional underwriting processes as presenting another layer of risk*** to those who could be hurt by defaults, including consumers, shareholders in mortgage lenders and investors in securities backed by mortgage loans.
>
> ***"There is more risk with a loan that is not fully documented***," says Suzanne Mistretta, senior director of residential mortgage at Fitch Ratings, because "borrowers can overestimate their income to obtain a larger loan they otherwise might not have qualified for.

104. On the subject of ***"Risk Layering,"*** the *Interagency Guidance* stated, in relevant part:

> Institutions that originate or purchase mortgage loans that combine nontraditional features, such as interest only loans with ***reduced documentation*** or a ***simultaneous second-lien loan,*** face ***increased risk.*** When features are layered, an institution should demonstrate that mitigating factors support the underwriting decision and the borrower's repayment capacity.

105. Because a HELOC is in second position to the first lien loan, it is secured only by the difference between the value of the home and the amount due on a first mortgage. Industry consensus is that HELOCs are at higher risk of becoming unsecured, and therefore worthless, in the event of a default, especially in a market with declining real estate values. Therefore, with respect to HELOCs, the *Interagency Guidance* cautioned:

> Simultaneous second-lien loans reduce owner equity and increase credit risk. Historically, as combined loan-to-value ratios rise, so do defaults. A delinquent borrower with little or no equity in a property may have little incentive to work with a lender to bring the loan current and avoid foreclosure. In addition, second-lien home equity lines of credit (HELOCs) typically increase borrower exposure to increasing interest rates and monthly payment burdens. Loans with minimal or no owner equity ***should not have a payment structure that allows for delayed or negative amortization*** without other significant risk mitigating factors.

106. Notwithstanding this unambiguously clear cautionary language in the *Interagency Guidance,* according to the October 24, 2007 *Wall Street Journal* Exposé, the vast majority of Countrywide's Pay Option ARMs featured layered-risk characteristics. According to WSJ, 78% of Countrywide's Pay Option ARMs originated in 2004 "were 'low-doc' mortgages in which the borrower didn't fully document income or assets" and the number grew to 91% in 2006. The Company's Form 10-Q for Q2 2007, filed with the SEC on November 9, 2007, also reveals that by the end of 2006, 81% of Pay Option ARMs held for investment by Countrywide were "low-doc" or "no-doc" stated income loans.

107. Moreover, as Countrywide originated more Pay Option ARMs with layered risk features such as reduced documentation and secondary-lien financing, the wholesale market appetite for Countrywide loan portfolios started to disappear. CW6 described one instance in April 2007, when Countrywide was unable to find a single buyer for a wholesale loan pool consisting of 100% financed loans that included risky, second-lien HELOCs. In fact, 13 investors refused to even look at the portfolio, and one investor looked at it but opted not to buy it. As a result, Countrywide had to keep this bad portfolio of risky, 100% financed loans on its books as LHI. This drop-off in secondary market sales

should have been seen as a clear signal to senior management that Countrywide's loan quality had hit rock bottom.

108. As it became more and more difficult for Countrywide to sell its loans on the secondary market, Countrywide had no choice but to increase the amount of Pay Option ARMs held by the Company for investment. As reported in Countrywide's periodic filings and reflected in the chart below, the amount of Pay Option ARMs held by the Company for investment grew significantly in 2004, 2005 and 2006 (in the millions):

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| **Pay Option ARMs Held for Investment** | N/A | 4,698 | 26,101 | 32,732 |

As of December 31, 2006, Pay Option ARMs represented 46% of the Company's total LHI. Additionally, Countrywide was required to increase its RIs in MBS containing nonprime and HELOCs which were sold by the Capital Markets division during the same period.[8]

109. Defendants knew, as highlighted in the public filings they controlled, that the key to the Company's success was quality control and verification of LHI, as well as the loans securitized and sold into secondary security markets, through the implementation and enforcement of appropriate underwriting standards. Indeed, Countrywide's ability to sell these loans quickly depended upon convincing investors in the secondary market that the loans being sold were of high quality. Among other things, this required Countrywide to make various R&Ws, which vouched for the accuracy of loan documents, to the secondary

[8] A retained interest provides an interest payment from a real estate mortgage investment conduit ("REMIC"). Retained interest holders receive interest payments from a REMIC after all required regular interest has been paid to other investors in higher priority securities tranches. Countrywide's retained interests would take the first losses if any mortgage pool underperformed, giving the securitization purchasers limited default protection.

market, giving secondary market participants recourse if the R&Ws proved to be untrue.

110. Countrywide's explosive origination of nontraditional loans between 2003 and 2008 may have been highly lucrative for the Company in the short term but, as Defendants knew or should have known, this constituted a high-risk activity that threatened the Company's core business, especially when the secondary market dried up and Countrywide had to hold more risky loans for investment and retain more interests in Pay Option ARM and HELOC securitizations. As a result, Countrywide's shift to risky loan products made it more vulnerable to liquidity constraints in the home mortgage market. Indeed, as recently as January 3, 2011, BofA announced a settlement to pay Fannie Mae and Freddie Mac a total of $2.8 billion to make good on R&Ws by Countrywide, who sold loans to these GSE's prior to the Merger that turned out to be fraudulent or violated fair lending laws. These facts and the risks associated with them were not disclosed to investors, and Plaintiff, who were damaged as a result.

**B. Countrywide Loosened Its Underwriting Standards**

111. At Defendants' direction, Countrywide pursued a lending campaign, beginning in 2003, that was characterized by chronic failures in standard appraisal, underwriting and credit qualification practices, and that heavily concentrated the Company's mortgage lending in risky Pay Option ARM loans, the overwhelming bulk of which were made on a less than fully documented basis. Unbeknownst to Countrywide's investors, including Plaintiff, from mid-2003 onward, concurrent with Countrywide's push to achieve a 30% market share, Countrywide continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006.

112. While the Officer Defendants consistently hyped the Company's underwriting and credit qualification processes, the truth was that Countrywide had actually lowered the Company's credit score requirements and eased other

qualifying criteria to facilitate the approval of huge volumes of loans, regardless of the credit quality of the loans or the magnitude of "exceptions" from the underwriting standards that would need to be granted in order to fund the loans. Countrywide and the Officer Defendants in fact were well aware that Countrywide had abandoned any discipline in these processes and had chosen to sacrifice quantity over quality in their reckless quest to become the nation's largest home lender. The loosening of the underwriting standards is evidenced by (a) the Company's Underwriting Matrices and (b) the Company's loan exception processing.

### 1. Countrywide Loosened Its Underwriting Standards As Indicated In The Company's Underwriting Matrices

113. The most direct evidence of Countrywide's systematic relaxation of lending standards can be seen in the key internal documents relied on by underwriters, loan officers, account executives and branch managers—called Underwriting Matrices—which were authored by Countrywide's highest-level managers at Countrywide's corporate headquarters. According to several CWs, Countrywide progressively loosened its guidelines in its Underwriting Matrices by reducing minimum credit scores needed to qualify for loans, allowing borrowers to finance more than the traditional 80% of the home's value, allowing borrowers to assume more debt load and making loans on little or no income or asset verification.

114. As an Operations Manager, CW5 was required to be familiar with Countrywide's underwriting and loan origination policies and procedures. CW5 regularly accessed the Underwriting Matrices through Countrywide's proprietary computer system called "CW Insider." According to CW5, the CW Insider system, which was developed in 2003 or 2004, acted like a one-stop website for all of Countrywide's lending divisions, to answer any questions a loan officer or account executive might have about any Countrywide loan product. According to

CW9, who was an FSL branch manager, all employees, even those who travelled, had access to Countrywide's Underwriting Matrices through their company computers.

115. Based on CW5's regular access to this proprietary system, CW5 is personally aware that the Underwriting Matrices were updated often. Specifically, the Company lowered minimum FICO[9] scores and other risk factors (e.g. time elapsed since a bankruptcy discharge, default, etc.) for the various risk grades of borrowers (ranging from AA+ to C-), while concurrently increasing maximum loan amounts steadily during the period from 2003 to 2007. In particular, CW5 recalls that Countrywide's guidelines were relaxed substantially at the beginning of 2005, when Countrywide increased its origination of interest-only ARM loans. FSL branch manager CW3 recalls that, between 2003 and 2005, Countrywide loosened loan-to-value restrictions as well as FICO score requirements in its underwriting guidelines. CW9 confirms that the underwriting standards reflected in the Underwriting Matrices loosened up in 2005 and 2006, at the height of the market when "everyone was doing the same kind of loans," i.e., subprime loans.

116. According to these CWs, management's rationale for loosening the guidelines contained in the Company's Underwriting Matrices was simple: the goal was to capture a population of borrowers with lower credit scores who previously would not have qualified for a loan. Under tighter guidelines, such loans would trigger an "exception" which would have likely resulted in the loan being refused. However, this loosening of the underwriting standards was never disclosed to investors.

[9] The Fair Isaac Credit Organization, or "FICO," score is one of the most widely accepted measures of the creditworthiness of a borrower. FICO scores range from 300-850, with the U.S. median approximately 720.